IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KORRIEN MARIE CASTRO : CIVIL ACTION
:
v. :
:
CLK MULTIFAMILY MANAGEMENT, :
LLC : NO. 11-1076

MEMORANDUM

McLaughlin, J.                                    January 24, 2013

This lawsuit arises out of an incident in July of 2010 when Jahli Clemens drowned in a swimming pool at an apartment complex owned by the defendant. The plaintiff, Jahli's mother, filed a complaint in 2011, alleging that the defendant was negligent with respect to the maintenance, control, and supervision of the pool area.

The defendant CLK Multifamily Management, LLC now moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. The Court will grant the defendant's motion.

I. Summary Judgment Record

The Court's description of the summary judgment record will be divided into two sections. Undisputed facts will be presented first, followed by a summary of the relevant disputed facts read in a light most favorable to the plaintiff. See Sheridan v. NGK Metals Corp., 609 F.3d 239, 251 n.12 (3d Cir.

2010).

A. <u>Undisputed Facts</u>

On July 11, 2010, Jahli Clemens, the plaintiff's son, died as a result of drowning in a pool located on the grounds of Sweetbriar Apartments in Lancaster, Pennsylvania. Defendant Motion for Summary Judgment/Plaintiff Opposition ¶¶1-2. At the time of the incident, Defendant CLK owned the Sweetbriar Apartments. Defendant Motion for Summary Judgment/Plaintiff Opposition ¶3.

Jahli Clemens was born on August 25, 2007, and was not yet three years old at the time of the incident. Defendant Motion for Summary Judgment/Plaintiff Opposition ¶5. Jahli did not know how to swim and prior to July 11, 2010, had been in a swimming pool on only three prior occasions. Def. Ex. A, pg 33., lines 5-10; pg. 36, line 23-24 and pg. 37, line 1.

Shavon Melendez was a tenant of the Sweetbriar Apartments. Defendant Motion for Summary Judgment/Plaintiff Opposition ¶4. Ms. Castro and her children visited Ms. Melendez the weekend of July 4, 2010, and July 11, 2010; it was Ms. Castro's second visit to Sweetbriar during which the incident occurred. Defendant Motion for Summary Judgment/Plaintiff Opposition ¶¶8-9.

On the first visit during the weekend of July 4, 2010,

Jahli was brought to the swimming pool, but he refused to enter it. Pl. Ex. I, pg. 46, lines 3-9.

A 6 foot fence surrounds the pool area. Def. Ex. B. During the 2010 swimming season, the pool was open from 10 a.m. to 8 p.m. Def. Ex. D pg. 177, line 24. When the pool is closed, a padlock is used to lock the pool gate. Def. Exhibit E, pg. 20, lines 2-6.

Sweetbriar Apartments operated the pool pursuant to a bathing permit issued by Manheim Township that was valid at the time of the incident. Def. Ex. F. Representatives of the Commonwealth of Pennsylvania inspect the pool each year. Def. Ex. D, pg. 124, lines 1-3. The pool is inspected by Sweetbriar personnel on both a quarterly and annual basis. Def. Ex. D, pg. 124, lines 4-12; pg. 125, lines 18-25.

Signs setting Sweetbriar's Pool Rules were posted near the pool gate. Def. Ex. H; Def. Ex. A., pg. 55, lines 23-24. The Rules stated: "There is no lifeguard on duty, swim at your own risk;" "For safety, running, pushing, wrestling or horseplay is not allowed." Def. Ex. H.

A second sign was posted to the right of the pool gate that read: "Do not swim alone" and "Parents are responsible for their children's safety." Def. Ex. H. Both signs were present at the time of the incident. Def. Ex. I, pg. 98, lines 21-24; pg. 99, lines 1-6.

Shavon Melendez, as a resident of Sweetbriar, received a copy of the "Sweetbriar Swimming Pool Policies." Def. Ex. J. In order for tenants to receive a copy of the key to the pool, tenants must sign a copy of the Sweetbriar Swimming Pool Policies, which Ms. Melendez did on May 20, 2010. Def. Ex. J. The Sweetbriar Swimming Pool Policies also states: "The swimming pool is swim at your own risk; there is no lifeguard on duty; children are solely the responsibility of their parents or guardians." Def. Ex. J.

Shortly before the incident, Shannon Nunez, the property manager, sent a letter to Sweetbriar residents stating that if the following behaviors do not stop, we will close the pool until further notice: Children under 14 are not permitted in the pool area at all without a parent/guardian; Each apartment is allowed 2 guests only. Pl. Ex. S. The letter itself is undated, but the deposition testimony states the letter was circulated not long before the incident. Pl. Ex. T, Pg. 25 lines 13-25; Pg. 26, lines 1-16; Pl. Ex. J, Pg. 90, lines 8-23, stating the letter was distributed about a week prior to the incident.

The letter also stated that the building realizes that outsiders are using the pool after the pool has been closed by jumping the fence and advises that No Trespassing signs have been posted but tenants should also contact the police to report such trespassers. Pl. Ex S.

On July 11, 2010, Ms. Castro, Jahli Clemens, Kai Clemens, Ms. Tellechea, MS. Melendez and Ms. Meldendez's two children arrived at the pool at approximately 2:00 p.m. Def. Ex. A, pg. 78, lines 4-7. Initially Jahli was wearing floaties on his arms, but before the incident the floaties were removed and not put back on. Def. Ex. A., pg. 92, lines 5-16.

After approximately 30 to 45 minutes, Ms. Castro and Ms. Melendez went to purchase food for the group. Def. Ex. A., pg. 88, lines 19-24. After eating, Jahli told Ms. Castro that he needed to use a restroom. Def. Ex. I, pg. 38, lines 6-24. Jahli walked to Ms. Meldendez's apartment to use the restroom. Def. Ex. I, pg. 38, lines 6-24; pg. 39, lines 1-9. After using the restroom in Ms. Melendez's apartment, Jahli returned to the pool area. Def. Ex. I, pg. 40, lines 4-9.

Ms. Castro testified that Jahli then asked her if she would get a skateboard from the car for him; Ms. Castro responded that she was still eating and would retrieve the skateboard when she had finished. Def. Ex. A, pg. 102, lines 17-24; pg. 103, lines 1-2. Jahli also asked to use the restroom a second time; Ms. Castro did not grant him permission to go at that moment because he had used the bathroom recently. Ex. I, pg. 144, lines 1-8.

After a period of time passed, Ms. Castro realized Jahli was missing; Ms. Castro testified she did not know

5

precisely how long passed between the last time she saw Jahli and the time she realized he was missing. Def. Ex. A, pg. 115, lines 19-22.

Ms. Castro testified that she "probably" took her eyes off Jahli and that she "wasn't paying attention because if I would have paid attention, I would have been able to see what happened." Def. Ex. A., pg. 116, lines 10-18.

After realizing Jahli was missing, Ms. Castro first looked for him in Ms. Melendez's apartment and then in the parking lot. Def. Ex. A., pg. 117, lines 2-19. Ms. Melendez started to walk the path Jahli would have taken to get out of the pool. As she was walking, she heard some children say in Spanish "what is that?". Ms. Melendez then jumped into the pool and pulled Jahli out of the water. Def. Ex. I., pg. 45, lines 16-24. Eventually, emergency medical personnel arrived and transported Jahli to Lancaster General Hospital, where doctors were unable to revive him and he was pronounced dead.

Defendant's pool safety expert Maria Bella produced a report about the incident and concluded that CLK controlled and supervised the pool in accordance with the rules established by Manheim Township and the Commonwealth of Pennsylvania and that Jahli was not properly supervised by his guardians, which caused his drowning. Def. Ex. Q, Maria Bella Report, pg. 19.

Plaintiff's pool safety expert Shawn DeRosa produced a

report that concluded that CLK failed to exercise reasonable supervision and control of the swimming pool, which directly contributed to the drowning death of Jahli Clemens. Pl. Ex. AA, DeRosa Report, pg. 5. The DeRosa report also concluded that the defendant, through its on-site property management staff, failed to take reasonable steps to minimize risks of injury at the pool. Pl. Ex. AA, DeRosa Report, pg. 7.

Shawn DeRosa acknowledges in the plaintiff's expert report that it is "unquestionable that Korrien Castro lost sight of her son for however short of time that may have been." Pl. Ex. AA, DeRosa Report, pg. 8. The DeRosa report further states, "I do acknowledge a lapse in supervision, but I also recognize that this lapse in supervision is far too common among parents who supervise their children at swimming pools." Pl. Ex. AA, DeRosa Report, pg. 9.

B. <u>Disputed Facts Read in the Light Most Favorable to the Plaintiff</u>

There are two relevant factual issues in the summary judgment record that are in dispute, which the Court will view in the light most favorable to the plaintiff.

The first disputed issue is whether the gate to the pool area was effectively self-closing. Plaintiff has identified evidence in the record supporting the claim that at the time of the incident the gate would not automatically self-close due to

7

problems with the spring mechanism on the gate.  See Pl. Ex. K, Pg. 18, lines 17-23; Pg. 30, lines 4-18; Pl. Ex. J, Pg. 19, lines 7-14.

The second issue is the degree of overcrowding in the pool area at the time of the incident.  Although the record does not provide a precise account of how many people were in the pool area, the Court accepts the plaintiff's general factual assertion that the pool area was crowded the day of the incident.  Pl. Ex. T. Pg. 21 lines 23-25, ("it was pretty crowded"); pg. 24, lines 3-6 ("really crowded that day"); Pl. Ex. W, pg. 111, lines 3-7 (Q: "every chair at the pool was taken that day?" A: "Oh yeah, it was crowded"); Def. Ex. A Pg. 88, lines 6-10, (estimating that there were maybe 25 or 20 kids and adults at the pool when Ms. Castro arrived).

II. Analysis[1]

---

[1] A party is entitled to summary judgment if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, which may be satisfied by demonstrating the party who bears the burden of proof lacks evidence to support his case. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A fact is "material" if it might affect the outcome of the suit under the governing law and "genuine" if a reasonable jury could find for the nonmoving party based on the evidence presented on the issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In making its determination, the court must consider the evidence in a light most favorable to the nonmoving party. See Sheridan 609 F.3d 251 n.12.

The defendant's motion for summary judgment raises two legal issues: (1) whether the plaintiff has established a cause of negligence against defendant; and (2) whether the Court should dismiss the plaintiff's claim for punitive damages. The Court will consider each of those issues in turn.

A.  <u>Negligence Claim</u>

To establish a cause of action for negligence, plaintiff must establish four elements: (1) the existence of a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the breach of duty and the resulting injury; and (4) actual loss or damage. <u>Dorsey v. Continental Associates</u>, 591 F.2d 718, 718 (Pa. Super. 1991).

The plaintiff has offered a number of theories regarding the defendant's negligence, none of which sufficiently meet the four-prong test for a negligence claim. The Court analyzes each negligence theory below.

1.  <u>Lack of a Lifeguard</u>

Plaintiff argues that there was no lifeguard on duty at the pool at Sweetbriar Apartments and under the Commonwealth of Pennsylvania Swimming and Bathing Places Statute, a Recreational Swimming Establishment "shall have on duty an adequate number of certified lifeguards to protect the safety of users."

9

Commonwealth of Pennsylvania Swimming and Bathing Places Statute 18.42.

However, a Recreational Swimming Establishment is a defined term, and the statute specifies that "The term excludes those facilities owned by condominiums, other property owner associations, rental arrangements that include three or more families or social units, hotels or motels, campgrounds, private clubs and private organizations which do not provide access to the general public." Commonwealth of Pennsylvania Swimming and Bathing Places Statute 18.1.

Sweetbriar falls within the statutory exclusion so it was not required to have a certified lifeguard. Even viewing the factual dispute about overcrowding at the pool area in the light most favorable to the plaintiff, the record does not show that the defendant provided "access to the general public" so the argument that defendant was negligent for failing to provide a lifeguard in accordance with the statute fails.

## 2. Pool Area Overcrowding

More generally, the plaintiff argues that the defendant was negligent because it allowed the pool area to become dangerously overcrowded. There is evidence, specifically in the form of the Nunez letter that was distributed to the tenants before the incident, that the defendant was aware that some

10

tenants were in violation of pool rules regarding bringing no more than 2 guests into the pool area.

Even assuming that the defendant breached a duty by not more effectively addressing the problem of pool overcrowding, however, the plaintiff's negligence theory falls short with respect to the causal connection between that breach of duty and the resulting injury.

The plaintiff attempts to meet the causality requirement by suggesting that Jahli was pushed into the pool by another child, who either would not have been in the pool area or would have been better supervised if the defendant had not permitted overcrowding.

However, the plaintiff is not able to establish from the record that Jahli was indeed bumped or pushed into the pool, let alone by a child who was in the pool area and unsupervised due to the overcrowding problem. The plaintiff's own briefing and expert report both acknowledge the possibility that Jahli entered or accidentally fell into the pool on his own.

The plaintiff points to a deposition from Pamela Kirchgessner, another tenant at Sweetbriar at the time of the incident who was at the pool that day, who noted that there was a seemingly unsupervised child pushing other children that day. Pl. Ex. W, Pg. 87, lines 5-8. However, in that same deposition, Pamela Kirchgessner made clear that she did not see how Jahli

11

entered the water or see the unsupervised child push anyone who was not in his group.  Pl. Ex. W, Pg. 31, lines 2-8; Pg. 113, lines 11-19.

There is no testimony or other evidence establishing that Jahli was pushed into the pool by another person in the pool area, and the plaintiff cannot meet the causation requirement by simply offering a theory of events based on speculation.

### 3. Defective Gate Locks

Another theory of negligence that the plaintiff has advanced is based on the allegation that the gate to the pool area was not properly self-locking at the time of the incident. The Court views the disputed fact regarding the efficacy of the lock in the light most favorable to the plaintiff, but again causality issues prevent the Court from concluding that the defendant was negligent.

As an initial matter, it is undisputed that Jahli was brought into the pool area by his mother so defective gate locks had nothing to do with Jahli's presence in the pool area.

The plaintiff argues that there is a causal connection between the status of the locks and the resulting injury because Jahli's mother, Ms. Castro, did not immediately search for him in the bottom of the pool when she discovered that he was missing. Plaintiff argues that if the gates were self-locking, Ms. Castro

would not have started searching for Jahli by going to Ms. Melendez's apartment.

The problem with this argument is that there is no evidence in the record to substantiate the theory that if the gates had been self-locking or if the defendant had put a sign advising the plaintiff to look for her child in the pool first that the injury would have been avoided. It is undisputed that the plaintiff took her eyes off Jahli, and some amount of time, which the plaintiff could not recall precisely, passed before he disappeared.

The plaintiff has presented no medical evidence to support the theory that Jahli would have survived if Ms. Castro had initially searched in the pool for him after realizing he was missing.

Moreover, the evidence does not establish that the situation with the gate or the lack of a warning sign impacted how long it took for Jahli to be discovered. Ms. Castro testified that she did not ascribe much significance to the status of the gate. Def. Ex. A, pg. 82, lines 19-22. Therefore, Ms. Castro may well have gone to search for Jahli at Ms. Melendez's apartment because of her prior conversations with Jahli about him wanting his skateboard or to go to the bathroom, irrespective of the status of the gate lock.

13

### 4. Failure to Close Down the Pool Area

Finally, the plaintiff asserts a global negligence theory that given all the problems with the pool that the defendant was aware of, the defendant should have shut the pool area down entirely. If the defendant had done that, plaintiff argues, Jahli would not have been brought into the pool area and the incident would not have occurred.

This negligence theory solves the but-for causality problem present in some of plaintiff's other theories, though issues with proximate cause remain. The Court need not reach those causality issues, however, because the plaintiff cannot sustain the allegation that the defendant breached a duty by not shutting down the pool area in its entirety. The plaintiff has not cited, nor has the Court found in its independent review, any precedent establishing that the defendant breached a duty by not shutting down the pool area given the instant circumstances.

Although the defendants were aware of issues related to the pool area, as evidenced by the Nunez letter, those concerns were about tenant compliance with building rules such as pool use by unauthorized guests, not about safety issues that would have created an immediate duty to close down the pool area entirely.

Accordingly, the Court finds that each of the plaintiff's theories of negligence is deficient and the defendant's motion should be granted.

B.  <u>Punitive Damages</u>

Because the Court concludes that the plaintiff has failed to establish a negligence claim against the defendant, the plaintiff's claim for punitive damages is rendered moot.

III. <u>Conclusion</u>

For the foregoing reasons, the defendant's motion is granted and judgment is entered in favor of CLK Multifamily Management, LLC.

An appropriate order follows.